## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN RIVERS<br>1101 14th St. NW, Suite 1400<br>Washington, DC 20005<br><br>NATIONAL AUDUBON SOCIETY<br>225 Varick St.<br>New York, NY 10014<br><br>SIERRA CLUB<br>National Headquarters<br>2101 Webster St., Suite 1300<br>Oakland, CA 94612<br><br>HEALTHY GULF<br>935 Gravier St., Suite 700<br>New Orleans, LA 70112<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>U.S. ARMY CORPS OF ENGINEERS<br>441 G Street NW<br>Washington, DC 20314-1000<br><br>U.S. FISH and WILDLIFE SERVICE<br>1849 C Street, NW<br>Washington, DC 20240<br><br>　　　　*Defendants*. | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Rivers, National Audubon Society, Sierra Club, and Healthy Gulf (collectively the "Conservation Organizations") file this Complaint for Declaratory and Injunctive Relief against the U.S. Army Corps of Engineers ("Corps") and U.S. Fish and Wildlife Service ("Service"), and allege as follows:

## INTRODUCTION

1.      This case challenges the Corps' illegal decision to approve a massive pumping plant that would drain some of the Nation's richest wetland and aquatic resources in a sparsely populated area of Mississippi.  The late Senator John McCain described this agricultural drainage project as "one of the worst projects ever conceived by Congress," while the Environmental Protection Agency ("EPA") decisively vetoed the pumps during the George W. Bush Administration due to the unacceptable adverse impacts on wildlife and fisheries.

2.      Yet, the Corps hastily approved the construction and operation of the same vetoed pumping plant during the last days of the Trump Administration, relying on the same flawed analysis rejected by EPA in 2008 as contrary to the facts and law.  By repeating those same errors, the Corps severely underestimated the pumps' devastating impacts and failed to inform the public about the true costs of the project.  The Corps also refused to consider viable alternatives to the pumps that would provide prompt, effective, and environmentally sound flood relief to communities.  The Corps' uninformed decision contravenes core requirements of the Clean Water Act, Water Resources Development Act ("WRDA"), National Environmental Policy Act ("NEPA") and Endangered Species Act.

3.      The Yazoo Backwater Area contains one of the few remaining intact bottomland hardwood forested wetlands in the Lower Mississippi River Alluvial Valley.  Periodic flooding sustains vital wetland habitat for a highly productive floodplain fishery and globally significant

1

migratory bird foraging grounds.  In fact, 60 percent of all North American bird species depend upon the Mississippi River basin's habitats, including 40 percent of all waterfowl and shorebirds that migrate along the Mississippi River Flyway.  The Yazoo Backwater Area provides hemispherically significant habitat to more than 28 million migrating birds annually.

4.      EPA safeguarded this ecosystem in 2008 by exercising its authority under Section 404(c) of the Clean Water Act to veto the construction and operation of a 14,000 cubic feet per second (cfs) pumping plant (hereinafter the "Yazoo Pumps Project") proposed by the Corps, and each alternative plan considered by the Corps that included a pumping plant.  The Veto ensures against the "unacceptable adverse effects" of any variation of the pumps that impacts more than 28,400 acres of wetlands in an area that provides vital habitat to more than 450 species of birds, fish, and wildlife.

5.      EPA has issued only 13 Section 404(c) vetoes since the Clean Water Act was enacted in 1972, out of approximately 2 million activities approved by the Corps during that timeframe. EPA has never revoked a veto.

6.      EPA and the public repeatedly urged the Corps to consider alternatives to the prohibited pumping plant, including modern approaches to floodplain management and flood risk reduction.

7.      The Corps nevertheless insisted on approving the long-vetoed and outdated Yazoo pumps, notwithstanding the Veto and without consideration of any alternatives.  The Corps based its decision on a Final Supplemental Environmental Impact Statement prepared in 2020 (hereinafter the "2020 FSEIS") that categorically refused to consider "any new alternatives" and instead insisted on the same pumping plant at a nearby location with the exact same key features as the vetoed Yazoo Pumps Project (hereinafter the "Yazoo Pumps Redo").

8.      The Yazoo Pumps Redo plainly violates the Veto.  It includes the same 14,000 cfs pumping plant whose construction would require the discharge of fill material into the same wetlands prohibited by the Veto, and whose operation would cause unacceptable adverse effects far in excess of the amount prohibited by the Veto.  The Corps cannot unilaterally override the Veto, which EPA has not lawfully revoked.

9.      The Corps refused to consider any alternatives to the pumps, despite being presented with a proposed alternative at the outset of the public process that could be implemented quickly through existing federal programs to provide prompt, effective, sustainable, and environmentally sound relief to communities in the Yazoo Backwater Area.  The 2020 FSEIS did not even mention this alternative, known as the Resilience Alternative, and instead focused solely on approving the pumps, even though new data shows that the pumps would not prevent flooding in the vast majority of the Yazoo Backwater Area, would increase flood risks for communities, and would likely cost taxpayers far in excess of $450 million.  As a result, the Corps overlooked reasonable alternatives in violation of NEPA and failed to demonstrate that the Yazoo Pumps Redo is the least environmentally damaging practicable alternative—a threshold requirement of the Clean Water Act.

10.     The Corps also blinded itself and the public to the significant and unacceptable adverse impacts of the Yazoo Pumps Redo by relying on the same unduly constrained analysis rejected by EPA in the Veto.  By repeating this error, the 2020 FSEIS excludes consideration of the pumps' impacts on at least 96,139 acres of wetlands—an area over twice the size of Washington D.C.—and thereby severely underestimates the pumps' significant adverse impacts on vital wetland functions.  Even the severe underestimate of wetland impacts in the 2020 FSEIS shows

3

that the Yazoo Pumps Redo would cause significant and unacceptable degradation to wetlands and their associated functions, in violation of the Clean Water Act.

11. The Corps also failed to consider the significant risk to downstream and Yazoo Backwater Area communities created by the pumps, which would discharge up to 9 billion gallons of water per day into the Yazoo River when the River is at flood stage. The Corps instead rejected the notion of any such risk by referencing a summary report based on a model that an expert review deemed too flawed to provide any type of reliable analysis. Compounding this error, the Corps misrepresented the results of that model and failed to inform the public about the significant risks to downstream communities, as well as the risk of overtopping the Yazoo Backwater levee, which would flood the Yazoo Backwater Area.

12. The Corps' incomplete analysis, in turn, infected its conceptual proposal to mitigate the pumps' impacts. The Corps did not provide any mitigation to offset the pumps' significant adverse impacts on thousands of acres of wetlands excluded from the 2020 FSEIS. The Corps also failed to provide a specific and detailed mitigation plan, despite its obligation to do so. Instead, the Corps relied on a hypothetical, wait-and-see approach that plainly violates the Clean Water Act and WRDA and is destined to fail. In fact, the Corps' own data show that its conceptual mitigation proposal will not offset even the severe underestimate of wetland impacts identified in the 2020 FSEIS. EPA concluded that the Corps' mitigation was so inadequate that it would "preclude a private party from receiving a Section 404 permit" under the Clean Water Act.

13. The Corps' haste to approve the pumps was so great that it did not respond to more than 50,500 public comment letters opposing the project, including technical comments submitted by citizens and scientists detailing the flaws in the 2020 Draft SEIS. The Corps also failed to carry

out the mandatory independent external peer review process imposed by Congress as a safeguard against uninformed decision-making.  And the Corps prematurely terminated the requisite consultation with the Service, and thereby failed to ensure the project would not jeopardize federally threatened and endangered species protected by the Endangered Species Act.  The Service, in turn, violated its obligation to reinitate formal consultation in the face of the Corps' recalcitrance and new information revealing adverse impacts to endangered species.

14.     The Conservation Organizations seek vacatur of the Corps' decision and 2020 FSEIS, along with appropriate declaratory and injunctive relief under the Administrative Procedure Act ("APA"), because the Corps' decision is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## JURISDICTION AND VENUE

15.     This action arises under the Clean Water Act, NEPA, WRDA, Endangered Species Act, and APA, 5 U.S.C. §§ 702–06.  This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. §§ 2201-02 (declaratory judgment).

16.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391 because the lead plaintiff, American Rivers, resides in the District of Columbia and a substantial part of the events giving rise to the claims occurred within the District of Columbia.

17.     This case is related to the pending lawsuit in the District of Columbia captioned *American Rivers v. U.S. Environmental Protection Agency*, No. 1:21-cv-00097-DLF (Jan. 12, 2021).

# PARTIES

## I.   Plaintiffs

18.   American Rivers is a national non-profit organization headquartered in Washington D.C. whose mission is to protect wild rivers, restore damaged rivers, and conserve clean water for people and nature.  Since 1973, American Rivers has protected and restored more than 150,000 miles of rivers through advocacy efforts, on-the-ground projects, and its annual America's Most Endangered Rivers campaign, which highlights and advocates for rivers that are confronted by imminent decisions that will determine the health of the rivers' futures.  Since 1995, American Rivers has advocated against the Corps' proposal to construct and operate the Yazoo Pumps Project because of its significant and unacceptable impacts on wetlands, fish and wildlife, water quality, and downstream flooding.  Construction and operation of the proposed 14,000 cfs pumping plant would cause large-scale, widespread degradation of the Yazoo Backwater Area, harming the interests of American Rivers and its members who routinely visit this area to canoe, birdwatch, fish, hunt, and otherwise enjoy some of the Nation's richest fisheries, wildlife habitat, and bottomland hardwood forested wetlands.

19.   The National Audubon Society ("Audubon") is a non-profit conservation organization established in 1905 that works to protect birds and the places they need throughout the Americas.  Guided by the belief that where birds thrive people prosper, Audubon engages its network of more than 1.8 million members, state programs, nature centers, and chapters from around the country.  Audubon has long regarded the Lower Mississippi River Delta and the Yazoo Backwater Area as a globally significant ecoregion that is vital to the overall ecological health of the Mississippi Flyway.  Audubon members and supporters were instrumental in securing EPA's veto of the Yazoo Pumps Project to protect these rich habitats, and safeguarding this decision is a significant priority for Audubon.  Audubon is a leading voice in advocating for

an alternative strategy to the Pumps that would provide immediate, effective, and affordable flood relief recovery and long-term protections for birds and communities that depend on the Mississippi Flyway. Audubon's members frequent the Yazoo Backwater Area to enjoy its many recreational opportunities, such as birdwatching, hiking, paddling, and photography, and to conduct community science projects; these activities would be severely impacted by the proposed pumping plant project.

20.     The Sierra Club is a national non-profit organization that was established in 1892 and has 3.8 million members. Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote responsible use of the earth's ecosystems and resources; and to educate and encourage the public to protect natural resources. Sierra Club has long advocated against the Corps' attempt to construct and operate a pumping plant in the Yazoo Backwater Area because of the unacceptable adverse impacts on fish and wildlife and water quality. Instead, Sierra Club has supported non-structural alternatives that would provide marginalized communities with equitable, just flood relief and long-term protections. This advocacy has included public education, the dissemination of issue papers, involvement in public comment periods, and appearances at public hearings. Sierra Club's members have a long-standing connection to the Yazoo Backwater Area, which they have used for outdoor recreation, such as hiking, paddling, and wildlife watching. The Yazoo Pumps Redo would significantly impair their members' enjoyment of this special, unique place while failing to deliver any meaningful flood relief for communities.

21.     Healthy Gulf is a twenty-five year old environmental nonprofit organization focused on the health of the Gulf of Mexico, its wetlands and waters, and the communities dependent upon them. The organization empowers people to protect and restore the natural resources of the Gulf

of Mexico region, often assuming a watchdog role.  Formerly titled Gulf Restoration Network, the organization commented on the Yazoo Pumps Project, and engaged in organizing efforts to protect wetlands there.  It advocated against filling and degrading wetlands to construct and operate a pumping plant, and proposed instead non-structural flood control alternatives less disruptive to wetland habitats, soils, streams and wildlife in the Yazoo Backwater Area.  Healthy Gulf's members frequently visit the Yazoo Backwater Area to enjoy its ecological richness and biodiversity through activities such as hiking, paddling, and birdwatching, all of which would be adversely impacted by the proposed pumping plant.

22.     The Conservation Organizations have long opposed the Corps' attempts to construct and operate a massive pumping plant in the Yazoo Backwater Area due to the unacceptable adverse effects on some of the Nation's most valuable wetlands, wildlife, and fishery resources.  The Conservation Organizations also oppose the long-vetoed pumps project because it could create significant flood risks for downstream communities and the Yazoo Backwater Area—concerns raised by both the conservation community and EPA—without delivering the purported flood damage reduction benefits claimed by the Corps.

23.     The Conservation Organizations and EPA have instead advocated for non-structural and natural infrastructure solutions—including such things as conservation and flood easements, wetland restoration, flood proofing or elevation of structures, purchasing flood-prone properties, and voluntary relocations—to reduce flood risks and increase community resilience in the Yazoo Backwater Area.

24.     The Conservation Organizations provided the Corps and EPA with a detailed alternative proposal (known as the "Resilience Alternative") at the outset of the Corps' public process that includes a suite of proven, low-cost, natural infrastructure and non-structural measures that

would provide prompt, effective, sustainable, and environmentally sound relief to communities in the Yazoo Backwater Area while providing significant ecological benefits. Yet, the Corps flatly refused to consider this alternative or any other alternative in the 2020 FSEIS, and instead insisted on completing the same 14,000 cfs pumping plant prohibited by the Veto.

25.    The Conservation Organizations documented their significant concerns with the Yazoo Pumps Redo in detailed comment letters sent to the Corps on June 15, 2020, November 30, 2020, and January 11, 2021. The Conservation Organizations sent the Corps and the Service a Notice of Intent to Sue under the Endangered Species Act on February 9, 2021.

**II.    Defendants**

26.    The U.S. Army Corps of Engineers is a federal agency headquartered in the District of Columbia that made the illegal decision at issue in this Complaint.

27.    The U.S. Fish and Wildlife Service is the agency within the United States Department of Interior responsible for administering the provisions of the Endangered Species Act with regard to species listed as either threatened or endangered, including the endangered pondberry.

## LEGAL BACKGROUND

**I.    Clean Water Act**

28.    Congress enacted the Clean Water Act in 1972 with the objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

29.    Congress established several goals for the Act, including attainment and preservation of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(2).

30.    To further these goals, Congress prohibited the "discharge of any pollutant" into navigable waters except in accordance with the Clean Water Act. *Id.* § 1311(a).

9

31.     Congress granted the Corps authority to issue permits for the discharge of dredged or fill material under Section 404 of the Clean Water Act.  *Id.* § 1344.  Section 404(a) allows the Corps to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  *Id*. § 1344(a).

32.     The Clean Water Act directs the Corps to evaluate sites for the discharge of dredged or fill material "[s]ubject to subsection (c) of this section" and "through the application of guidelines developed by the [EPA] Administrator."  *Id*. § 1344(b).  Accordingly, before granting a Section 404 permit or approving one of its own water resources projects, the Corps must satisfy both the Section 404(b)(1) Guidelines—the binding regulations promulgated by the EPA—and any restrictions on discharges established through Section 404(c) by EPA.

33.     The Corps must evaluate its own water resource projects under the environmental criteria set forth in the Clean Water Act Section 404(b)(1) Guidelines, which are the enforceable regulations promulgated by EPA.  *See* 33 C.F.R. Part 320; 40 C.F.R. Part 230.  The Guidelines explicitly apply to the Corps when it seeks to approve its own water resources projects.  33 CFR § 336.1(a).

34.     The Guidelines prohibit the Corps from authorizing any discharge of dredged or fill material: (1) if a practicable alternative to the proposed discharge would have less adverse impact on the aquatic ecosystem; (2) if the discharge will cause or contribute to significant degradation of the environment; (3) if the discharge will cause or contribute to violations of water quality standards; (4) if the discharge will jeopardize a listed species or adversely modify critical habitat protected by the Endangered Species Act; or (5) if the project proponent has failed to take all appropriate steps to minimize potential adverse impacts.  40 C.F.R. § 230.10.

35.     Section 404(c) of the Clean Water Act grants the EPA Administrator the authority to preclude or override the Corps' decision to issue a 404 permit or authorize its own project to dredge or fill jurisdictional waters.  33 U.S.C. § 1344(c).  Section 404(c) is commonly referred to as EPA's "veto authority."  Congress granted this backstop authority to EPA in recognition of its role as the "environmental conscience" of the Clean Water Act.

36.     Section 404(c) authorizes the EPA Administrator to "prohibit the specification . . . of any defined area as a disposal site" whenever he or she determines "that the discharge of such materials will have an unacceptable adverse effect on . . . fishery areas (including spawning and breeding areas), wildlife," and other resources.  *Id.*  In making this determination, the Administrator must provide "notice and opportunity for public hearings" in order to determine whether a proposed project will cause unacceptable adverse effects.  *Id.*

37.     EPA's regulations define an "unacceptable adverse effect" to include an "impact on an aquatic or wetland ecosystem which is likely to result in … significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas."  40 C.F.R. § 231.2(e).  EPA is to consider both direct and secondary impacts in determining whether an adverse effect is unacceptable.

38.     Section 404(c) authorizes EPA to prohibit, deny, or restrict the discharge of dredged or fill material at a disposal site.  To "prohibit specification" of a disposal site means "to prevent the designation of an area as a present or future disposal site."  40 C.F.R. § 231.2(b).

39.     EPA's regulations set forth a rigorous process to ensure that the Administrator exercises the authority to veto a project consistent with the unacceptable adverse effects standard and after an opportunity for public comment.  *Id.* § 231.3(a).

40.     EPA's regulations centralize the decision-making process with EPA Headquarters in

Washington D.C. "to ensure consistency and to set some precedents for future guidance."  Denial

or Restriction of Disposal Sites Section 404(c) Procedures, 44 Fed. Reg. 58,078, 58,081 (Oct. 9,

1979).

41.     EPA has used its veto authority sparingly, vetoing just 13 projects, since the enactment of

the Clean Water Act in 1972.  Over that timeframe, the Corps has approved approximately 2

million activities under Section 404.

42.     EPA has never revoked a veto.

**II.     Water Resources Development Act**

43.     Congress enacted multiple acts establishing the policies, procedures, and programs

applicable to the development, construction, and operation of federal water resources projects by

the Corps, and to authorize the study and construction of federal water resources projects.  The

Conservation Organizations refer to these acts collectively as the Water Resource Development

Act ("WRDA").

44.     The WRDA requires the Corps to mitigate all losses to fish and wildlife caused by a

water resource project, unless the Secretary determines that the adverse impacts to fish and

wildlife would be "negligible."  33 U.S.C. § 2283(d)(1).  In addition, the Corps "must ensure that

impacts to bottomland hardwood forests are mitigated in-kind, and other habitat types are

mitigated to not less than in-kind conditions, to the extent possible."  *Id.*

45.     The WRDA also requires the Corps to provide "a specific plan to mitigate for damages to

ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses

created by such project."  *Id.*  The specific mitigation plan must include a series of components,

including at a minimum:

- A detailed description of the type, amount, and characteristics of the habitat being restored, a description of the physical actions to be taken to carry out the restoration, and the functions and values that will be achieved;

- A detailed description of the ecological success criteria, based on replacement of lost functions and values, that will be evaluated and used to determine mitigation success;

- A description of the lands and interest in lands to be acquired for mitigation, and the basis for determining that those lands will be available;

- A mitigation monitoring plan that includes the cost and duration of monitoring, and identifies the entities responsible for monitoring if it is practicable to do so (if the responsible entity is not identified in the monitoring plan it must be identified in the project partnership agreement that is required for all Corps projects). Corps mitigation must be monitored until the monitoring demonstrates that the ecological success criteria established in the mitigation plan have been met; and

- A contingency plan for taking corrective action in cases where monitoring shows that mitigation is not achieving ecological success as defined in the plan.

*See id.* § 2283(d)(3).

46.     The WRDA also requires the Corps to comply with "the mitigation standards and policies established pursuant to the regulatory programs" administered by the Corps, including the Section 404(b)(1) Guidelines discussed above.  33 U.S.C. § 2283(d)(3)(A).

47.     In addition, the WRDA requires the Corps to subject project studies to "a peer review by an independent panel of experts" if the project's total costs, including mitigation costs, exceed $200 million or if the project is "controversial."  33 U.S.C. § 2343(a)(3)(A)(i), (iii).  A project is controversial if "there is a significant public dispute as to the size, nature, or effects of the

project" or "there is a significant public dispute as to the economic or environmental costs or benefits of the project." *Id.* § 2343(a)(4).

48.     In all cases, the peer review must be carried out concurrently with the project study and must be completed "not more than 60 days after the last day of the public comment period for the draft project study," unless the Chief of Engineers determines that more time is necessary. *Id.* § 2343(b)(1).

### III.    National Environmental Policy Act

49.     Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.  NEPA implements the precautionary principle to think first, then act, and requires agencies, "to the fullest extent possible … use all practical means, consistent with the requirements of [NEPA] and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions on the quality of the human environment." 40 C.F.R. § 1500.2(d).[1]

50.     NEPA recognizes the fundamental importance of public involvement in decisions that affect the quality of the environment. *Id.* § 1500.1(b) (requiring that agencies make "high quality" environmental information available to public officials and citizens "before decisions are made and before actions are taken."); *id.* § 1502.1 (environmental impact statement must

---

[1] The Complaint cites to the 1978 NEPA regulations, which govern the Corps' review. *See* NEPA Regulations, 43 Fed. Reg. 55,978 (Nov. 29, 1978).  The Corps started and carried out most of the study before the effective date of the new regulations on September 14, 2020. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,340 (July 16, 2020).  The Corps did not advise the public that it was going to use the new NEPA regulations, *id.*, and indeed, referred to the old regulations in a programmatic agreement signed on January 13, 2021.

provide decisionmakers and public a "full and fair discussion" of impacts and of reasonable alternatives to avoid or minimize impacts).

51.     To fulfill Congress's twin aims of comprehensive environmental analysis and broad, informed public involvement, federal agencies must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

52.     An EIS must rigorously and objectively evaluate a range of reasonable alternatives to the proposed action.  42 U.S.C. § 4332(C)(iii) & (E); 40 C.F.R. § 1502.14.  This analysis "is the heart of the NEPA process" and provides "a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.

53.     The EIS must take a hard look at the environmental impacts of a proposed project and "provide [a] full and fair discussion of significant environmental impacts" associated with a federal decision.  *Id.* § 1502.1.  The EIS must include a discussion of the direct, indirect, and cumulative impacts for each reasonable alternative, so that the agency can take a hard look at these impacts before reaching a decision.  *Id.* § 1502.15.  The EIS should also identify "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C)(ii).

54.     Federal agencies have an ongoing obligation to supplement their analysis in light of "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  A supplemental environmental impact statement must evaluate any new alternatives and revaluate prior alternatives in light of the new information or changed circumstances.  *Id.*; 40 C.F.R. § 1502.14.

55.     An agency preparing an EIS has a duty to assess, consider, and respond to all comments submitted by the public.  40 C.F.R. § 1503.4(a).

**IV.     Endangered Species Act**

56.     The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  Its purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).  Congress enacted the Endangered Species Act to achieve two purposes: to provide for the protection of imperiled species to prevent their extinction, and to facilitate recovery of those species so that they no longer need the protections provided by the Endangered Species Act.

57.     To achieve its twin objectives of survival and recovery, the Endangered Species Act directs the Service to determine which species of plants and animals are "threatened" or "endangered." *Id*. § 1533.  A species is "endangered" if "it is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).

58.     Section 7 of the Endangered Species Act prohibits federal agencies from undertaking actions that are "likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification of" critical habitat. *Id*. § 1536(a)(2). "Jeopardy" results when it is reasonable to expect, "directly or indirectly," that the action would appreciably reduce "the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

59.     To ensure compliance with section 7's substantive mandate, the Endangered Species Act and its implementing regulations impose specific procedural duties on federal agencies, requiring an "action agency"—in this case, the Corps—to consult with the Service before undertaking any

"action" that "may affect" a listed species or its designated critical habitat. 16 U.S.C.

§ 1536(a)(2); 50 C.F.R. § 402.14(a).

60.     As a first step, the federal action agency prepares a biological assessment ("BA").  50

C.F.R. §§ 402.02, 402.12.  The BA must evaluate the potential "effects of the action" on listed

and proposed species and designated and proposed critical habitat within the "action area" and

determine whether any such species or habitat are "likely to be adversely affected by the action."

*Id*. § 402.12(a), (c).

61.     If the action agency determines that a proposed action "may affect" an endangered or

threatened species, the agency must engage in formal consultation with the Service.  *See* 50

C.F.R. § 402.14(a) ("Each Federal agency shall review its actions at the earliest possible time to

determine whether any action may affect listed species or critical habitat. If such a determination

is made, formal consultation is required . . . .").

62.     Through the formal consultation process, the Service issues a Biological Opinion

assessing whether the proposed action, taken together with its cumulative effects, is "likely to

jeopardize the continued existence of listed species or result in the destruction or adverse

modification of critical habitat." 50 C.F.R. § 402.14(g)(4).  The Biological Opinion's finding

must be based on the Service's independent analysis of the "effects of the action"—including the

action's "indirect effects" and effects of "interrelated or interdependent" activities—and the

"cumulative effects" on listed species or critical habitat.  *Id*. §§ 402.02, 402.14(g).

63.     Where a proposed action may affect species, formal consultation is only excused if (1)

the action agency determines, as a result of its biological assessment or as a result of informal

consultation with the Service, that the proposed action is not likely to adversely affect any listed

species or critical habitat, *and* (2) the regional director of the Service, or authorized representative, provides a written concurrence.

## V.      Administrative Procedure Act

64.     The APA requires the court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

65.     An agency's decision is arbitrary and capricious if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

66.     Under the APA, an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  *Id.*

## FACTUAL BACKGROUND

## I.      The Yazoo Backwater Area Sustains Some of the Nation's Richest Wetland and Aquatic Resources.

67.     The Lower Mississippi River Alluvial Valley once supported 25 million acres of forested wetlands that extended along both sides of the Mississippi River from Illinois south to Louisiana and the Gulf of Mexico, as depicted in the figure below.



Figure 1: Location of the Yazoo Basin in northwestern Mississippi (Klimas et al. 2011:2)

68.     Over the past 100 years, however, both flood control projects and land clearing for agriculture have eliminated approximately 80% of the bottomland forested wetlands in the Lower Mississippi River Alluvial Valley.  These landscape scale changes have fundamentally altered wildlife habitat and reduced the biological diversity and integrity of this vital ecosystem.

69.     The Yazoo Basin in northwestern Mississippi contains one of the last existing and most substantial tracts of highly productive bottomland hardwood forested wetlands in the Lower Mississippi River Alluvial Valley.  The portion of this area relevant to the Yazoo Pumps Project—referred to throughout this Complaint as the Yazoo Backwater Area—"lies in west-central Mississippi between the mainline Mississippi River east bank levee and the hill line on the east," which comprises about 926,000 acres, as depicted below and defined as the Yazoo Backwater Project Area in the final supplemental environmental impact statement prepared by the Corps in 2007 ("2007 FSEIS").



70.     The Yazoo Backwater Area contains some of the richest wetland and aquatic resources in the Nation, including a highly productive bottomland hardwood forest and a floodplain fishery that supports at least 95 different species of fish.

71.     The Yazoo Backwater Area is also a globally significant migratory bird foraging ground located in the heart of the Mississippi Flyway—a major continental migration corridor that funnels birds through the midcontinent from as far north as the Arctic Circle and as far south as South America, as depicted below.



72.     The Yazoo Backwater Area provides significant habitat to 257 bird species, including 60

percent of all North American bird species that depend on the Mississippi River basin, 40 percent

of the Nation's waterfowl and shorebirds, and numerous species recognized as federally and/or

state threatened or endangered.  More than 28 million birds use the Yazoo Backwater Area each

year.

73.     In total, the Yazoo Backwater Area provides vital habitat supporting more than 450

species of birds, fish, and wildlife.

74.     The stunning biodiversity of the Yazoo Backwater Area is largely a product of the area's

complex floodplain hydrology.  The hydrologic cycle of water moving into and out of the area

fuels the fundamental biological processes essential to wetlands, fish, and wildlife productivity.

75.     EPA has identified hydrology—which includes water depth, flow patterns, and the

duration and frequency of flooding—as the single most important determinant of wetland types

and functions.  Even small alterations in wetland hydrology can produce significant, ecosystem-wide changes in species composition and richness and in ecosystem productivity.

76.     Federal and State agencies have spent many millions of dollars to conserve the vital floodplain ecosystem in the Yazoo Backwater Area.  As a result, the area contains at least 250,000 acres of conservation lands, including nationally significant public lands.

**II.     The Corps Proposes the Yazoo Pumps Project.**

77.     The Corps has constructed multiple large-scale flood control projects in the Yazoo Backwater Area, including a system of levees, channels, and flood gates that have greatly reduced flood levels in the Yazoo Backwater Area during flood events on the Mississippi and Yazoo Rivers.  When high water stages occur on the Mississippi and Yazoo Rivers, the Corps can close the Steele Bayou flood control gate to prevent flows from backing up into the Yazoo Backwater Area.  Significant additional reductions in flood levels are provided by the Yazoo Backwater Levee.  According to the Corps, collectively these projects have reduced flood levels in the Yazoo Backwater Area by 1 to 3 feet.

78.     In 2007, the Corps released a Final Supplemental Environmental Impact Statement ("2007 FSEIS") that proposed construction of a 14,000 cfs pumping plant in the Yazoo Backwater Area to drain water, primarily from low-lying agricultural lands, during certain types of flood events to facilitate increased agricultural production on those lands (known as the Yazoo Pumps Project).

79.     The fundamental objective of the project was to limit the spatial extent, frequency, and length of time the Yazoo Backwater Area floods.

80.     The 2007 FSEIS identified four alternatives that would satisfy the project objective without the need for a pumping plant.  These alternatives emphasized "nonstructural" measures, such as reforestation of cleared agricultural lands, conservation easements, income insurance,

and relocation or flood-proofing of structures, to address flooding issues while avoiding the unacceptable adverse impacts of the pumps.  The 2007 FSEIS, however, eliminated all of these non-structural alternatives from consideration.

81.     The 2007 FSEIS focused on five alternatives that included a 14,000 cfs pumping plant—the primary "structural" component of the project.  This pumping plant would be located near the Steele Bayou flood control gates and would pump surface water out of the Yazoo Backwater Area when the flood gates are closed to prevent high water events on the Mississippi River from causing flooding in the Yazoo Backwater Area.

82.     The five alternatives varied with respect to pump-on-elevation, non-structural features (such as conservation measures), and operating plans for the Steele Bayou flood control gates to alter water levels during low-water periods (i.e. when the pumps are not operating).

- Plan 3 included a 14,000 cfs pumping plant with a pump-on elevation of 80 feet[2] from March 1st to October 31st, and 85 feet from November 1st to February 28th.  It also included a non-structural measure that would modify operation of the Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water periods (as compared to the existing criteria, which holds the water level at 68.5 to 70 feet).

- Plan 4 included a 14,000 cfs pumping plant with a year-round pump-on elevation of 85 feet.  The non-structural measures included reforestation/conservation easements on 37,200 acres of agricultural lands from willing sellers only, and modified operation of the Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water periods.

---

[2] All elevations are based on National Geodetic Vertical Datum.

- Plan 5 (the Yazoo Pumps Project and the Corps' recommended plan) included a 14,000 cfs pumping plant with a year-round pump-on elevation of 87 feet. The non-structural measures included conservation easements/reforestation on up to 55,600 acres of agricultural lands from willing sellers only, and modified operation of the Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water periods.

- Plan 6 included a 14,000 cfs pumping plant with a year-round pump-on elevation of 88.5 feet. The non-structural component included reforestation/conservation easements on 81,400 acres of agricultural lands from willing sellers only, as well as modified operation of the Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water periods and reintroduce water up to 87 feet.

- Plan 7 involved a 14,000 cfs pumping plant with a year-round pump-on elevation of 91 feet. The non-structural feature included reforestation/conservation easements on 124,400 acres of agricultural lands from willing sellers only, and modified operation of the Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water periods and reintroduce water up to 87 feet.

83.     Construction of the 14,000 cfs pumping plant would require the discharge of dredged or fill material into approximately 43.6 acres of forested wetlands and other waters of the United States near the Steele Bayou flood control gates. The discharge would occur at the pumping plant site, the existing inlet and outlet channels, various roadways and levees, and the borrow area where the Corps proposed to obtain additional fill material. The borrow area at the Steele Bayou flood control gates covers approximately 23 acres of wetlands.

84.     Operating the pumping plant would cause large-scale hydrological alterations to the aquatic ecosystem in the Yazoo Backwater Area, including alterations to the water depth, flow

24

patterns, and the duration and frequency of flooding.  The 2007 FSEIS, however, only analyzed the impacts of operating the pumping plant on a small subset of wetlands in the Yazoo Backwater Area.  Even that unduly constrained analysis showed that the recommended pumping plant and various alternatives evaluated would degrade the ecological functions provided by at least 28,400 to more than 67,000 acres of wetlands in the Yazoo Backwater Area.

**III.    EPA Vetoes the Yazoo Pumps Project Due to the Unacceptable Adverse Impacts to Wildlife and Fisheries.**

85.    In 2008, the EPA vetoed the Yazoo Pumps Project under Clean Water Act Section 404(c), including all of the alternatives proposed by the Corps that contained a 14,000 cfs pumping plant, due to the unacceptable adverse effects on fish and wildlife in the Yazoo Backwater Area.

86.    EPA's decision reflected the culmination of decades of review of the project by the EPA, the Corps, and the Service.  The Veto was a priority of the George W. Bush Administration's EPA and Department of the Interior, both of which believed there were less environmentally damaging ways to provide flood damage reduction.  Both the EPA and Service have consistently urged the Corps to consider those alternative approaches.

**A.    EPA Provides a Comprehensive Analysis of the Yazoo Pumps' Unacceptable Adverse Impacts on Wetland Functions and Aquatic Resources.**

87.    To accurately assess the adverse impacts of the Yazoo Pumps Project, EPA first determined the full extent of wetlands in the Yazoo Backwater Area.  According to the Corps' 1987 Wetland Delineation Manual, an area is a wetland if a survey identifies a hydrophytic plant community, hydric soils, and primary or secondary indicators of wetland hydrology.  EPA conducted a statistically valid field survey of the Yazoo Backwater Area in coordination with the Corps, the Service, and the Natural Resources Conservation Service.  This survey identified

approximately 212,284 acres of wetlands in the 100-year floodplain that satisfy the three parameters of a wetland.

88.     EPA assessed the adverse impacts of the Yazoo Pumps Projects on the functions provided by these wetlands.  As documented in the Veto, wetlands in the Yazoo Backwater Area perform a series of functions that depend on periodic overbank flooding.  During flood events, wetlands store floodwaters, which are then released slowly over time thereby reducing water levels, velocities, and the associated erosion in downstream channels.  Wetlands also improve water quality by filtering pollutants imported to the wetland by flooding, such as the pesticides generated by extensive agricultural operations in the Yazoo Backwater Area.  At the same time, wetlands support aquatic food webs by exporting significant amounts of organic carbon to downstream ecosystems.

89.     Flooded wetlands also provide vital aquatic habitat for over 58 different species of fish in the Yazoo Backwater Area.  For example, when a wetland floods, it provides rearing habitat for fish, which can access abundant food on the floodplain.  Wetlands also provide fish with vital spawning habitat, if they flood for at least eight consecutive days to a depth of at least one foot, from March to May.  These flood depth and duration requirements ensure suitable time for nest construction and other spawning activities by adult fish.  If water recedes too quickly off the flooded wetland, eggs may become stranded and desiccated.

90.     Shallowly flooded wetlands also provide foraging grounds for waterfowl, shorebirds, over-water nesting waterbirds and wading birds.  For example, shorebirds depend on these "stop-over" habitats to refuel and accumulate fat reserves during northbound (spring) migrations.  As noted in the Veto, "[f]ewer shallowly flooded wetlands will reduce foraging habitat, which will equate to reduced nutritional uptake and could result in higher mortality or reduced reproductive

fitness as the birds travel the great distances between their southern wintering areas and their breeding areas in the northern U.S., Canada, and the Arctic."

91.     Small changes in the frequency, duration, and depth of flooding in the Yazoo Backwater Area can dramatically impair or eliminate these vital wetland functions, causing massive changes in species composition and richness and in ecosystem productivity.  For example, a wetland does not provide any habitat at all for fish species, if it no longer experiences overbank flooding. Likewise, a wetland does not provide vital spawning habitat, if it no longer receives eight consecutive days of at least one foot of overbank flooding.

92.     Overbank flooding also acts like an on-off switch for multiple wetland functions.  If a wetland no longer receives overbank flooding, it by definition no longer performs such functions as detaining river floodwaters and exporting organic carbon.

93.     The Yazoo Pumps Project would reduce the timing, duration, and frequency of flooding in areas above the 1-year floodplain.  As a result, it would reduce or cut off the hydrological cycle of overbank flooding that is critically important to maintenance of project-area wetland and aquatic habitat values, including fisheries production.

94.     EPA determined, based on the Corps' 2007 FSEIS, that the Yazoo Pumps Project would degrade wetland functions on more than 67,000 acres of wetlands, that the other alternatives that included a pumping plant would degrade wetland functions on more than 28,400 acres of wetlands, and that these impact levels would cause significant and unacceptable impacts to wetlands, wildlife and fisheries.

95.     EPA also concluded that the 2007 FSEIS severely underestimated impacts to wetlands and aquatic resources by constraining its analysis to only a small subset of the Yazoo Backwater Area's vitally important wetlands—that portion located within the 2-year floodplain that receive

27

≥ 14 consecutive days of flooding.  EPA rejected this unduly narrow analysis because it excluded

approximately 52,000 acres of wetlands that perform critical functions, even though they flood

for less than 14 consecutive days or are located above the 2-year floodplain.  To remedy this

oversight, EPA undertook its own comprehensive analysis and demonstrated that the pumps

would eliminate or significantly degrade the ecological functions provided by at least 24,000

acres of additional wetlands in the 2-year floodplain that were not considered in the 2007 FSEIS,

thereby exacerbating the significant and unacceptable adverse impacts of the Yazoo Pumps

Project that were acknowledged by the Corps.

### B.     EPA Vetoes the Construction and Operation of the Yazoo Pumps Project in the Yazoo Backwater Area.

96.     To prevent the unacceptable adverse impacts caused by the operation of a 14,000 cfs

pumping plant, EPA prohibited the specification of the wetlands and other waters of the United

States located within the Yazoo Backwater Area as a present or future disposal site for the Yazoo

Pumps Project, including for each alternative proposed by the Corps that included a 14,000 cfs

pumping plant.

97.     The Veto states that the "adverse effects associated with the prohibited projects are the

result of a combination of operational factors including the capacity of the pumping station and

its associated pump-on elevations."  Accordingly, the Veto's findings of unacceptable adverse

effects apply to any "derivatives of the prohibited projects that involve only small modifications

to the operational features or location of these proposals [which] would also likely result in

unacceptable adverse effects and would generate a similar level of concern and review by EPA."

98.     Consistent with these statements, EPA vetoed a modified alternative ("Modified

Alternative 6") proposed by the Corps because it contained the same 14,000 cfs pumping plant

with a pump-on elevation of 88.5 feet.  Although EPA did not have precise estimates of the

alternative's operational impacts on wetlands, it noted they "would likely fall between 28,408 and 48,066 acres," thereby causing unacceptable adverse impacts in violation of the Clean Water Act.

99. While the Veto forecloses the prohibited pumps projects (each of which included a pumping plant "structural" feature), it allowed the Corps to move forward with non-structural alternatives, including those identified in the 2007 FSEIS that the Corps eliminated from consideration. The Veto explicitly expressed EPA's "sincere effort" to work with the Corps, local project sponsor, and interested parties to develop alternative, non-structural forms of flood protection for the Yazoo Backwater Area.

100. The Veto forecloses construction and operation of a 14,000 cfs proposed pumping plant "within the geographic area identified by the [2007] FSEIS" and without the need to withdraw lands outside of the Yazoo Backwater Area as a present or future disposal site, as preliminarily recommended by EPA Region IV.

**IV. EPA Repeatedly Urges the Corps to Consider Available Alternatives to the Pumps.**

101. Prior to, as part of, and since issuing the Veto in 2008, EPA has repeatedly urged the Corps to consider non-structural alternatives to the Yazoo Pumps Project, such as the approach outlined in the Resilience Alternative proposed by the Conservation Organizations.

102. In 2014, EPA declined the Corps' request to withdraw or modify the Veto, and instead restated its willingness to explore alternatives that would be more sustainable than the pumps.

103. In 2015, EPA declined the Corps' request to modify or withdraw the Veto because such an approach would be "inconsistent with the law" and would do little to identify cost-effective and technically feasible flood protection.

104. In August 2019, EPA declined to reevaluate the Veto because the purportedly updated wetlands analysis that the Corps provided to EPA failed to fix the errors in the 2007 FSEIS,

which severely underestimated the impacts to wetlands.  Because the Corps simply recycled

those same errors, EPA concluded that the Corps' flawed analysis "was not sufficiently

comprehensive to provide the type of record that would be required to evaluate a potential

modification or withdrawal of the Final Determination."  EPA also reiterated its long-standing

position of providing an opportunity for public notice and comment prior to its consideration of

any request to alter a final veto.

**V.     The Corps Proposes the Same Vetoed Pumps Project Based on the Same Flawed Analysis Rejected by EPA.**

105.    In 2019, the Corps announced its intent to prepare a supplemental environmental impact

statement based on new data and analysis in the Yazoo Backwater Area.

106.    The Corps promised to address "the concerns raised in 2008" by the EPA in the new

supplemental environmental impact statement.  But the Corps did not do this.

107.    Instead, the 2020 FSEIS refused to consider "any new alternatives" to the vetoed pumps

project and repeated the same flawed analysis rejected by EPA in 2008 because it severely

underestimates the pumps' significant and unacceptable adverse impacts on wetland functions,

wildlife, and fisheries.

**A.     The Corps Proposes Construction and Operation of the Same 14,000 cfs Pumping Plant Vetoed by EPA.**

108.    The Yazoo Pumps Redo shares the same fundamental objective of the vetoed pumps

projects, which is "the reduction in interior flooding during backwater flood events. When

activated, the pumps will lower the water surface of floods greater than the 1-year frequency

flood, which will reduce the extent and duration of the flood."  In fact, the 2020 FSEIS refuses to

consider any new goals or objectives for the Yazoo Pumps Redo.

109.     The primary "structural" feature of the Yazoo Pumps Redo would be a 14,000 cfs pumping plant with a pump-on elevation of 87 feet.  This is the same structural feature with the same exact operational parameters as the long-vetoed Yazoo Pumps Project.

110.     Construction of the Yazoo Pumps Redo would require the discharge of dredge and fill material into the same wetlands prohibited from specification by the Veto.  As stated by the Corps:  "The borrow area identified for the previous design will be used for the new design." This borrow area is "north of and adjacent to the Steele Bayou structure" and "was identified to provide fill material for the previous design."  This borrow area contains 23 acres of wetlands that would be directly impacted by construction of the Yazoo Pumps Redo, and all of which were prohibited from specification by the Veto.

111.     The 2020 FSEIS also relies on the same environmental documents to analyze the Yazoo Pumps Redo (i.e. "tiers to" the 2007 FSEIS).  The 2020 FSEIS amplifies this problem by replicating the same flaws expressly rejected by the Veto.  For example, the 2020 FSEIS only considers impacts to the small subset of Yazoo Backwater Area wetlands considered in the 2007 FSEIS—those located within the 2-year floodplain that receive 14 or more consecutive days of flooding.  By recycling this unduly constrained analysis, the 2020 FSEIS once again omits "highly significant impacts" to wetlands, wildlife, and fisheries.  EPA rejected this approach in the Veto as it severely underestimates wetland impacts.  EPA again rejected this approach in its technical comments on the 2020 Draft SEIS because it excludes approximately 96,139 acres of known wetlands.

112.     Even though the 2020 FSEIS severely underestimates wetland impacts, it acknowledges that operation of the Yazoo Pumps Redo would degrade more than 38,774 acres of wetlands,

31

which far exceeds the level prohibited by the Veto due to the unacceptable adverse impacts on wildlife and fisheries.

113.    In addition, modeling data in the Corps' files (but not included in the 2020 FSEIS) shows that the Yazoo Pumps Redo would reduce, if not eliminate, backwater flooding on at least 22,601 acres of additional wetlands that flood for less than 14 consecutive days.  These additional impacts increase the unacceptable adverse impacts to wetlands, wildlife, and fisheries, just as was the case for the pumps projects prohibited by the Veto.

114.    Even though the Veto squarely prohibits the Yazoo Pumps Redo, EPA attempted to revoke the Veto's protections by stating that it does not apply to the Yazoo Pumps Redo in its cover letter transmitting comments on the 2020 DSEIS.  The Conservation Organizations challenged EPA's decision as arbitrary, capricious, and contrary to law in the related case, *American Rivers v. U.S. Environmental Protection Agency*, No. 1:21-cv-00097-DLF (Jan. 12, 2021).

> **B.    The 2020 FSEIS Refuses to Consider Any Alternatives to the Prohibited Pumps Project.**

115.    EPA and the public urged the Corps to rigorously evaluate alternatives to the vetoed pumps project, including modern approaches to reduce flood damages, such as the Resilience Alternative.  The 2020 FSEIS also provides new information and analysis that fundamentally alters the Corps' prior conclusions regarding alternatives to the pumps project, including the economic feasibility of the pumps themselves.  Yet, the Corps categorically refused to consider any new alternatives to the pumps, let alone reevaluate the feasibility of the pumps themselves.

116.    Since 2007, the Corps and others have made significant advancements in non-structural approaches to flood damage reduction.  EPA highlighted these advances in its scoping comments, including "new and previously unavailable information on additional technologies or

economic feasibilities of non-structural measures."  EPA also urged the Corps to consider "whether any previously analyzed or new alternatives warrant reconsideration alongside the Proposed [Yazoo Pumps Redo]."

117.     The Conservation Organizations proposed a new alternative to the pumps during the scoping period—the "Resilience Alternative"—that utilizes natural infrastructure and non-structural measures that are being employed by communities across the country to reduce flood damages, including purchasing wetland reserve and floodplain easements, voluntary buyouts and relocations, and flood-proofing infrastructure (e.g., elevating homes, buildings, and roads).

118.     The Resilience Alternative relies on funded and available federal programs to implement solutions that achieve the project purpose, which is "to provide reduced flood damages from the Mississippi and Yazoo Rivers to areas in the lower Mississippi Delta."  For example, the Resilience Alternative identifies at least 70,000 acres of frequently flooded or marginal agricultural lands that could be enrolled in easement programs, thereby providing landowners with immediate financial assistance and eliminating agricultural damages on enrolled lands, and reducing other flood damages throughout the Yazoo Backwater Area.  The Resilience Alternative also identifies millions of dollars of federal funding to reduce the risk of damage from future high water events and increase community resilience.  In addition, the Resilience Alternative identifies post-disaster recovery funds for voluntary buy-outs and elevations of "severe repetitive loss" and "repetitive loss" properties in the Yazoo Backwater Area.

119.     Yet, the Corps categorically refused to consider any new alternatives in the 2020 FSEIS, such as the newly proposed Resilience Alternative.

120.     The Corps also refused to reevaluate any of the alternatives from the 2007 FSEIS, despite new information and changed circumstances that calls into question a wide array of its prior

conclusions regarding the economic feasibility, costs, and benefits of the alternatives excluded from consideration in the 2007 FSEIS.

121.    In addition, the Corps refused to evaluate the economic feasibility of the Yazoo Pumps Redo, despite relying on the 2007 FSEIS to eliminate other alternatives on the grounds that they were not economically feasible.  This approach is internally inconsistent.  It also disregards new information in the 2020 FSEIS demonstrating that the Yazoo Pumps Redo is likely not economically feasible.

122.    The 2020 FSEIS provides new information demonstrating that the benefits of the pumps have declined significantly.  For example, the 2020 FSEIS claims that flood levels in the Yazoo Backwater Area have declined by 1 to 3 feet, as compared to the data in the 2007 FSEIS.  The 2020 FSEIS also identifies a sharp decline in population and housing levels in the Yazoo Backwater Area since 2007, coupled with a significant increase in lands enrolled in easements and lands owned by the State of Mississippi and managed as wetland systems.

123.    The 2020 FSEIS also provides new information demonstrating the ineffectiveness of the Yazoo Pumps Redo to reduce flood damages.  Even with the Pumps operating, 83% of flooded lands would still have been underwater during the 2019 flood—the event that prompted the 2020 FSEIS.  The Yazoo Pumps Redo would also have increased flood risks for downstream communities during the 2019 flood, including communities in north Vicksburg that were already suffering from excessive flooding, as well as for communities in the Yazoo Backwater Area.

124.    At the same time, new data shows that the costs of the pumps likely have ballooned to well over $450 million.  This new information demonstrates that the economic analysis in the 2007 FSEIS, which the Corps used to eliminate alternatives, is outdated and inaccurate.

125.   The Corps did not, however, evaluate any of this new information to determine whether the Yazoo Pumps Redo is economically feasible.  Nor did the Corps use the new information in the 2020 FSEIS to reevaluate alternatives excluded from consideration in the 2007 FSEIS on the grounds they were not economically feasible.

126.   The 2020 FSEIS also failed to undertake any analysis to demonstrate that the Yazoo Pumps Redo is the least environmentally damaging practicable alternative.  Instead, the Corps relied solely on the outdated alternatives analysis from its prior 2007 FSEIS.  But the 2007 FSEIS did not consider the Resilience Alternative, which avoids all adverse impacts on wetlands from operating the pumps and avoids any discharge of dredge or fill material into wetlands, making it less environmentally damaging than the Yazoo Pumps Redo.

127.   The Corps also overlooked the fact that the Yazoo Pumps Redo would cause even greater adverse impacts than the Yazoo Pumps Project.  Both projects involve construction and operation of a 14,000 cfs pumping station in the Yazoo Backwater Area.  On top of that, the Yazoo Pumps Redo would destroy an additional 84 acres of wetlands at Deer Creek, eliminate 52,900 acres of restoration, and forego beneficial changes to the operation of the Steele Bayou control structure, all of which increase the impacts as compared to the Yazoo Pumps Project.

   **C.    The 2020 FSEIS Ignores the Yazoo Pumps' Significant Adverse Impacts on Wetlands.**

128.   The Yazoo Pumps Redo would reduce the timing, duration, and frequency of flooding on wetlands located above the 1-year floodplain.  As a result, it would reduce or cut off the hydrological cycle of overbank flooding that is critically important to maintenance of project-area wetland and aquatic habitat values, including fisheries production.

129.   To assess the adverse impacts of the Yazoo Pumps Redo, however, the 2020 FSEIS did not determine the full extent of wetlands in the Yazoo Backwater Area based on the three

parameters identified in the Corps' 1987 Wetland Delineation Manual (i.e. having indicators of

wetland hydrology, soils and vegetation).

130.     Instead, the 2020 FSEIS once again limited its assessment to considering the impacts to

only a small subset of Yazoo Backwater Area wetlands—those located within the 2-year

floodplain that receive 14 or more consecutive days of flooding.  This approach is inconsistent

with the Corps' Wetland Delineation Manual, which defines wetland hydrology to include areas

that exhibit *either* surface inundation (i.e. flooding) *or* underground saturation (i.e. a water table

within 12 inches of the surface) for 14 consecutive days in most years.  By misapplying the

Manual, the 2020 FSEIS excludes wetlands that satisfy the criteria for wetland hydrology and

perform critical ecological functions, even if they flood for less than 14 consecutive days or are

located above the 2-year floodplain.

131.     In its public comments, EPA concluded that the Corps' analysis did not identify wetlands

"consistent with current regulations."  EPA identified 179,120 acres of wetlands in the 2-year

floodplain based on the presence of wetland hydrology, soils and vegetation.  That estimate

remains accurate.  Yet, the 2020 FSEIS included just 82,981 acres of those wetlands in its

analysis, thereby excluding consideration of impacts on more than 96,000 acres of wetlands.

132.     As a result, the 2020 FSEIS significantly understated the adverse impacts of the Yazoo

Pumps Redo on wetland functions, wildlife, and fisheries—and did so by repeating the very

same errors rejected by EPA in the Veto.

133.     The Service concluded that the 2020 FSEIS "significantly underestimated" impacts to

wetland functions.  As the Service explained in its Fish & Wildlife Coordination Act Report

(Jan. 10, 2021), the Corps' repeated "failure to consider shorter hydroperiod wetlands that flood

less than 14 days and/or wetlands in the Yazoo Study Area that are outside the two-year

floodplain (i.e. 2-5 year floodplain) means an estimated 24,000 acres of functional wetlands are not being accurately considered."

134.     In fact, the modeling data in the Corps' own files (but not included in the 2020 FSEIS) shows that the Yazoo Pumps Redo will reduce, if not eliminate, backwater flooding on at least 22,601 acres of wetlands in the 2-year floodplain that currently flood for less than 14 consecutive days.  If the Yazoo Pumps eliminates flooding on these wetlands, they will no longer provide any habitat for fish.  If the pumps reduce flooding on these wetlands so that they no longer receive eight consecutive days of inundation to a depth of one foot, as indicated by the Corps' data, they will no longer provide critical spawning habitat.  If the Yazoo Pumps Redo reduces flooding to a 5-year or greater return interval, which is also indicated by the Corps' hydrologic data, then these wetlands would, by definition, no longer perform critical functions, such as detaining floodwater and organic carbon export.  Yet, the 2020 FSEIS did not consider these significant losses in contravention of its own modeling data, EPA's detailed factual findings in the Veto, the Service's expert advice, and fundamental principles of wetland hydrology and science.

135.     Instead, the 2020 FSEIS forewent any analysis of the pumps' impacts to wetlands outside of its narrow scope of analysis based on the assumption that those wetlands would "persist" even in the absence of flooding.  In its public comments, EPA disagreed with this assumption because it entirely overlooks the pumps' adverse impacts on wetland functions, "which can be large even when a wetland persists (i.e., continues to meet the minimum federal criteria for wetland hydrology)."  So too, the Service disagreed with the Corps' assumption and clearly explained in its Fish & Wildlife Coordination Act Report that the role of backwater flooding "is not simply replaced by existing precipitation sources of hydrology."

136.    The 2020 FSEIS attempts to support this flawed assumption by citing to a paper by Berkowitz et al. (2019)[3] for the sweeping proposition that precipitation (i.e. rainfall) sustains the thousands of acres of wetlands located outside of the Corps' narrow scope of analysis.  But the Berkowitz study does not support this conclusion because it was based on extremely limited data and non-representative sample locations that cannot be extrapolated across the entire Yazoo Backwater Area.  The study was not based on a randomized, statistically valid sample of wetland locations; and it only monitored 12 sites for more than one year.  As stated by the Service, the Corps' attempt to extrapolate the Berkowitz study's finding across the entire Yazoo Backwater Area was "premature and inappropriate."

137.    Furthermore, the Berkowitz study's limited conclusions do not support—and in fact refute—the Corps' assumption that precipitation is a substitute for overbank flooding.  At most, the Berkowitz study asserts that precipitation can "sustain" wetlands by maintaining water tables within 12 inches of the surface (i.e. belowground).  But wetlands maintained by underground saturation do not provide the same functions as wetlands that experience overbank flooding.  For example, underground saturation does not provide habitat for fish or for many species of migratory waterfowl.  Likewise, other wetland functions—such as pollutant filtering, organic carbon export, and temporary flood storage—are lost or severely degraded without overbank flooding.  The Berkowitz study thus acknowledges that any "potential decrease in surface inundation has implications for wetland functional capacity and management."  The 2020 FSEIS disregards this critical caveat and thereby fails to analyze the significant adverse impacts of the pumps on wetland functions.

---

[3] Berkowitz, J.F., D.R. Johnson, and J.J. Price, "Forested Wetland Hydrology in a Large Mississippi River Tributary System," Wetlands (December 2019).

138.    EPA concluded that the Corps' analysis fails to comply with the requirements of the

Section 404(b)(1) Guidelines.  In its comments, EPA highlighted the Corps' failure to identify

the full scope of wetlands impacted by the Yazoo Pumps Redo.  EPA also disagreed with the

Corps' narrow scope of analysis because the 2020 FSEIS: (a) does not evaluate the "potential

effects on wetlands based on expected changes in flood duration and frequency;" (b) does not

evaluate "how the pumps project would impact wetlands that currently experience $\geq 7$ days of

flood inundation;" (c) does not evaluate "all flooded wetlands that are in the 5-year floodplain;"

and (d) does not evaluate "how many wetlands would no longer be within the 2-year and 5-year

floodplains with the pumps project implemented."

139.    Despite the 2020 FSEIS' narrow scope of analysis, it demonstrates that the Yazoo Pumps

Redo would degrade wetland functions on 38,774 acres of wetlands.  This level of impacts

constitutes significant and unacceptable degradation, as documented by the Veto.

**D.    The 2020 FSEIS Fails to Analyze the Yazoo Pumps' Impacts on Fish and Wildlife.**

140.    The 2020 FSEIS also fails to consider the pumps' extensive and irreversible impacts on

fish and wildlife.  In fact, EPA issued the Veto because the Yazoo Pumps "would result in

unacceptable adverse effects on fishery areas and wildlife."  Indeed, the Veto "is based solely on

environmental harms to fisheries and wildlife in the Yazoo Backwater Area" as "is appropriate

given the structure and language of the [Clean Water Act] and case law."

141.    As explained in the Veto, the pumps would degrade regionally, nationally, and

hemispherically important bird and waterfowl habitat, such as bottomland hardwood forests and

shallowly flooded wetlands.  In its comments on the 2007 FSEIS, the Department of the Interior

similarly concluded that the Yazoo Pumps "will have unacceptable adverse effects on fishery

areas, including spawning and breeding areas" and "unacceptable adverse effects on wildlife,

specifically to the area's breeding and migratory birds, including landbirds, shorebirds, wading birds, and waterfowl."

142.    Even though millions of birds rely on the wetlands in the Yazoo Backwater Area for critical life functions, the 2020 FSEIS simply ignored the pumps' impacts and instead falsely claimed that the pumps would have no direct, no cumulative, and minimal indirect impacts on these habitats.

143.    The 2020 FSEIS also severely underestimates the pumps' impacts on the Yazoo Backwater Area's highly productive floodplain fisheries, which supports at least 95 different fish species, if not more.  Of these, the Service estimates that over 58 species depend on backwater flooding and access to the floodplain to fulfill numerous life history requirements, such as spawning and rearing.  Though the pumps would eliminate thousands of acres of this habitat—a loss documented by EPA and the Service—the 2020 FSEIS simply ignored these impacts.

144.    The 2020 FSEIS contains no analysis at all of the pumps' impacts on amphibians and reptiles, despite the many species found in the Yazoo Backwater Area, the significance of the area's wetlands and flood pulse for their survival, and the specific and detailed request to carefully evaluate the impacts on these species by the Conservation Organizations.  The Veto documents 21 species of amphibians and 37 species of reptiles in the Yazoo Backwater Area, virtually all of which "benefit from the flood pulse," and concludes that the pumps "will adversely impact approximately 21 species of amphibians and 32 species of reptiles by disrupting their reproductive cycles and feeding opportunities and thereby reducing overall productivity."  Species at risk include the Western Alligator Snapping Turtle, which is listed as vulnerable in the state of Mississippi and is a candidate species for federal protection under the Endangered Species Act.  The population of Western Alligator Snapping Turtles in the Yazoo

Backwater Area is of paramount conservation value as population numbers of the species continue to decline range wide.

     **E.**     **The 2020 FSEIS Fails to Analyze the Yazoo Pumps' Impacts on Downstream Communities.**

145.    The Yazoo Pumps Redo would discharge up to 14,000 cfs of water (approximately 9 billion gallons per day) into the Yazoo River when the River is already at flood stage.  As a result, the pumps would increase the risk of flooding homes, communities, and infrastructure along the Yazoo River, including in areas downstream of the pumps (e.g., Vicksburg).

146.    The pumps would increase the risk of inundating the International Paper Plants' wastewater treatment ponds, which are located adjacent to the Yazoo River just downstream from the proposed pumping plant location, as shown in the map below.



147.    Inundating these wastewater treatment ponds could release significant amounts of toxic wastewater into the Yazoo River.

148.    The pumps could also increase the risk of overtopping or otherwise undermining the integrity of the Yazoo Backwater Levee.  According to a presentation prepared by the Corps, the Yazoo Backwater Levee had just 0.3 feet of remaining freeboard during the 2019 flood.



149.    The Yazoo Backwater Levee consists of "approximately 28 miles of earthen embankment" that currently has an elevated risk of crevassing as a result of overtopping, according to the National Levee Database.  The Yazoo Backwater Levee is not accredited due to its low elevation, which is well below the requisite base flood elevation plus three-feet of freeboard.

150.    In its comments, EPA urged the Corps to "evaluate the effects of discharging water from the [Yazoo Backwater Area] into the Yazoo River on homes, communities, and/or infrastructure along the Yazoo River, particularly in areas downstream of the Deer Creek site's pump discharge point (e.g., Vicksburg)."

151.    Despite these requests, and similar requests by the public, the Corps did not do so.

Instead, the 2020 FSEIS references findings in a November 2019 report derived from an

uncalibrated hydrological model that was deemed to be indefensible by an expert review.

152.    Dr. William Fleenor, an expert with more than 25 years of experience with hydrologic

modeling, reviewed the Corps' model and concluded that it "cannot be trusted to get a correct

answer" regarding the impact of the Yazoo Pumps on flood levels in the Yazoo River.  Dr.

Fleenor documented numerous errors in the Corps' model, including the lack of calibration and

failure to accurately represent real world conditions along the Yazoo or Mississippi Rivers.  The

Corps received Dr. Fleenor's expert report during the comment period.

153.    The Corps did not respond to Dr. Fleenor's report, defend the errors in the hydrologic

model, or take the time to correct those deficiencies.

154.    Even the Corps' flawed model shows that the pumps would have caused at least a 0.45

foot rise in some portions of the Yazoo River during the 2019 flood, with a margin of error of

plus or minus 0.5 feet.  Thus, the Corps' own model shows that the Yazoo Pumps could increase

flood stage in the Yazoo River by 0.95 feet—almost one extra foot of water when the Yazoo

River is already at flood stage.  The 2020 FSEIS did not disclose this risk to the public and did

not analyze the impacts of such an increase.

> F.    The 2020 FSEIS Relies on an Incomplete and Inadequate Mitigation Plan
> that Fails to Offset the Pumps' Significant Adverse Impacts.

155.    EPA concluded in its comments that the Corps' conceptual mitigation proposal "includes

a number of deficiencies that would preclude a private party from receiving a Section 404

permit."

156.    As an initial matter, the 2020 FSEIS does not provide a site-specific detailed mitigation

plan.  To the contrary, the 2020 FSEIS admits that "site-specific mitigation tracts have not been

identified" and that "decisions on the implementation of mitigation measures" and "a site-specific, detailed mitigation plan" will not be made until some future date when those sites are selected. As a result, the 2020 FSEIS does not identify the factors considered during the site selection process; does not describe the baseline ecological characteristics of any actual mitigation site, such as the existing plant community, historic or existing hydrology, or the extent of jurisdictional waters on the site; and does not provide a detailed written specification and work descriptions for the physical measures to be taken on any specific site to ensure its ecological success.

157.    Instead, the 2020 FSEIS relies on a conceptual framework upon which a future mitigation plan may or may not be based. EPA disagreed with this wait-and-see approach because it "is not permitted in the CWA Section 404 Regulatory Program." The Corps must identify the "specific mitigation site" so that it can evaluate the sites' baseline wetland functions and assess whether and to what extent mitigation measures will increase those functions. This information is essential to "ensure that proposed compensatory mitigation addresses the specific functional losses of impacted wetlands."

158.    In fact, even if the Corps' conceptual mitigation plan was eventually implemented, it could not offset the pumps' impacts on wetlands, wildlife, and fisheries, as demonstrated by EPA and the Service. As a threshold matter, the conceptual mitigation proposal is severely undersized because the 2020 FSEIS does not accurately assess mitigation needs. For example, the 2020 FSEIS does not consider the pumps' adverse impacts on thousands of acres of wetlands in the Yazoo Backwater Area that perform critical functions, including wetlands located above the 2-year floodplain and wetlands that flood for less than 14 consecutive days. As a result, the 2020 FSEIS does not propose any mitigation to offset the pumps' impacts on the functions provided

by these wetlands.  This is a significant shortfall, as explained by EPA in the Veto, because these wetlands provide critical fish spawning habitat, which "is the controlling resource for this project (i.e., the resource which suffers the greatest loss and requires the greatest amount of compensatory mitigation)."  Likewise, in the Fish & Wildlife Coordination Act Report, the Service concluded that "the ecological functions and values provided by backwater flooding within the Yazoo Study Area have not been accurately assessed, and consequently, are not being adequately mitigated for."

159.  Furthermore, the conceptual mitigation proposed by the Corps will not offset even the severe underestimate of impacts identified in the 2020 FSEIS.  For example, the Yazoo Pumps Redo would significantly degrade fish spawning and rearing habitat by reducing the frequency, duration, and depth of flooding on wetlands.  But the 2020 FSEIS miscalculates the amount of mitigation required to offset even the severe underestimate of fisheries resulting in a conceptual mitigation proposal that would not fully mitigate those adverse impacts.  For example, the 2020 FSEIS downplays the pumps' impacts on fish habitat by discounting the value of lost fish habitat by 40 percent, but then fails to apply that same discount to the fish habitat that the Corps proposes to create to mitigate those impacts.  As a result of this clear inconsistency, the 2020 FSEIS significantly understates the amount of mitigation required to offset the severe underestimate of fisheries impacts identified in the 2020 FSEIS.

160.  EPA and the Service also highlighted the Corps' failure to mitigate the pumps impacts on wetlands, including the critical functions provided by those wetlands.  For example, the 2020 FSEIS shows that the pumps would eliminate the pollutant-filtering ability of wetlands by at least 3,588 functional units.  Yet, the 2020 FSEIS only proposes 2,405 acres of reforestation, which would provide 813 functional units of pollutant filtering.  The Corps did not acknowledge

this four-fold shortfall.  Nor did it demonstrate that there is sufficient suitable acreage to offset this lost pollutant-filtering function, which would require reforestation on at least 10,641 acres (according to the Corps' assumptions).

161.    Due to these errors (and others), the Service concluded that the Corps' conceptual plan fails to ensure "that the loss of bottomland hardwoods, including their functions and values, were mitigated."  So too, EPA concluded in its comments that the Corps' analysis "does not ensure that specific functions will be adequately replaced."

162.    In addition, the 2020 FSEIS fails to demonstrate that the Corps' proposal to drill 34 groundwater wells far outside of the project area would offset adverse impacts from operating the pumps to drain wetlands during flood events.  As an initial matter, this out-of-kind mitigation is intended to increase the amount of water reaching certain streams during non-flood events when water levels in the streams are extremely low.  It does nothing to offset the adverse impacts to bottomland hardwood forested wetlands from a loss of overbank flooding or ensure that other types of wetland habitats are mitigated to not less than in-kind conditions.

163.    Moreover, the 2020 FSEIS does not demonstrate how much the groundwater wells would increase surface flows or water depths.  In fact, the 2020 FSEIS does not provide any analysis of "the fate of water once it reaches streams"—a significant oversight highlighted by EPA in its comments.  For example, the 2020 FSEIS entirely overlooks transmission losses (i.e., seepage into the stream bed), which is one of the major causes of surface water loss in the Big Sunflower River basin.  If the water discharged by the proposed wells seeps into the ground, it will not provide habitat for fish species, contrary to the Corps' assumption.  Even small declines in surface flows can significantly reduce the amount of aquatic habitat—another fact that the Corps failed to consider.

164.     There is thus no basis for the Corps' fact-free assumption that the groundwater wells would re-establish flows along 654 miles of streams.  Indeed, EPA concluded, there is "no data to support that use of the wells will result in the water quality or biological benefits" claimed by the Corps.

**VI.     The Corps Fails to Respond to Comments Identifying Significant Flaws in the 2020 FSEIS.**

165.     The Corps invited the public to submit comments on its Draft SEIS by November 30, 2020.  The Corps promised, "All public comments received will be addressed and considered as part of [the Corps'] decision-making process."

166.     Citizens, scientists, and public interest groups from Mississippi and across the country submitted approximately 50,500 comments on the Draft SEIS opposing the Yazoo Pumps Redo.  These comments in opposition to the project constituted the vast majority of all public comments received on the Yazoo Pumps Redo.

167.     The Conservation Organizations submitted 113 pages of detailed technical comments on the Draft SEIS along with a detailed expert analysis denouncing the model used by the Corps to assess downstream flood impacts, a detailed proposal for a Resilience Alternative, and 13 additional attachments consisting of hundreds of pages of information.

168.     In addition, more than 110 scientific professionals, the Society of Wetland Scientists, the Society of Freshwater Science, the North American Lake Management Society, the American Fisheries Society, and 120 conservation and social justice organizations submitted technical comments identifying flaws in the Corps' analysis.

169.     The Corps finalized the 2020 FSEIS on December 4, 2020—just 4 days after the close of the public comment period.

170.    The Corps' sole response to comments submitted by the public consisted of a scant five-paragraph general denial of the Conservation Organizations 113 page comment letter.

171.    The Corps did not provide any response to the other technical comments submitted by the public.

**VII.    The Corps Fails to Obtain the Mandatory Independent External Peer Review.**

172.    The WRDA requires the Corps to undertake an independent external peer review for civil works projects that will cost over $200 million or that are controversial.

173.    The 2020 FSEIS evaluates a civil works project—the Yazoo Pumps Redo—that will cost over $200 million.

174.    The 2020 FSEIS evaluates a civil works project that is controversial as that term is defined in WRDA.  There is a significant public dispute regarding the size, nature, and effects of the Yazoo Pumps Redo, as extensively detailed by the EPA, the Service, and the public.  There is also a significant public dispute regarding the economic and environmental costs and benefits of the project, which has also been extensively documented by the EPA, the Service, and the public.

175.    EPA repeatedly urged the Corps to undertake an independent external peer review.  In the Veto, EPA recommended an independent peer review process to ensure the Corps undertook a "balanced analysis" to identify a solution for reducing flood damages without the need for the prohibited pumps.  In 2019, EPA again urged the Corps to ensure that its data and analysis of the pumps project "meet data quality standards."

176.    The Corps did not subject the 2020 FSEIS or the Draft SEIS to an independent external peer review under the WRDA.

177.    The Corps did not explain why it did not subject the 2020 FSEIS to an independent peer review or provide any basis for failing to conduct such a review.

178.    The 2020 FSEIS makes no reference to an independent external peer review having been conducted, and does not include a report—or account for the findings of—an independent external peer review.

**VIII.    The Corps Unilaterally Terminates the Endangered Species Act Consultation with the Service.**

179.    The Yazoo Backwater Area sustains a number of federally listed species protected by the Endangered Species Act, including the endangered pondberry.  In early spring, this distinctive plant produces small clusters of yellow flowers, which are an important winter food source for pollinators, followed by green fruits that ripen to red by fall.  The pondberry is an obligate wetland species, meaning that it occurs almost exclusively in wetlands, and thus is a key indicator of wetland health.  The following figure depicts a pondberry colony in the foreground.



180.    The Service listed the pondberry as an endangered plant under the Endangered Species Act in 1986 due to the "tremendous[]" loss of the species caused by "land clearing and drainage activities in recent and historic times."

49

181.    In 2007, the Corps acknowledged that the construction and operation of the Yazoo Pumps

Project may affect the pondberry, but claimed that there would likely be no adverse effects to the

species.  The Service disagreed and insisted on formal consultation under the Endangered

Species Act to ensure the project would not jeopardize the species.  Through that process, the

Service prepared a comprehensive Biological Opinion, which concluded that the pumps project

would likely adversely affect the species by altering hydrology, including overbank flooding.

182.    Since the 2007 Biological Opinion, the Corps has documented "steep declines" in

pondberry colonies in the Yazoo Backwater Area.

183.    Nonetheless, the Corps claimed that the construction and operation of the same 14,000

cfs pumping plant would not adversely affect the pondberry because "precipitation inputs" (e.g.,

rainfall) would sustain wetlands.  In support of this contention, the Corps cited the Berkowitz

study discussed above.  The Corps thus refused to engage in formal consultation with the Service

to ensure the Yazoo Pumps Redo would not jeopardize the species.

184.    The Service flatly disagreed with the Corps' "not likely to adversely affect"

determination.  The Service concluded that the Corps "inappropriately extrapolated the findings

of Berkowitz (2019)" and "disregarded" the Service's prior findings regarding the role of

overbank flooding, which constitutes the best available science.  The Service concluded that the

Yazoo Pumps Redo "is likely to adversely affect pondberry" and thus urged the Corps to initiate

formal consultation to ensure against jeopardy.

185.    The Corps rejected the Service's expert conclusions, refused to undertake formal

consultation, and instead hastily signed the Record of Decision approving the project on January

15, 2021, just days before the end of the Trump Administration.

## FIRST CLAIM FOR RELIEF

### The Corps' Decision Violates the Clean Water Act and Administrative Procedure Act Because the Veto Prohibits the Yazoo Pumps Redo
### (33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)

186.   The Conservation Organizations incorporate by reference all of the preceding paragraphs.

187.   Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

188.   The Clean Water Act authorizes the EPA Administrator to "prohibit the specification … of any defined area as a disposal site" whenever he or she determines the discharge will "have an unacceptable adverse effect on" various resources, including "fishery areas" and "wildlife."  33 U.S.C. § 1344(c); *see also* 40 C.F.R. § 231.1(a).

189.   EPA exercised its authority under Section 404(c) of the Clean Water Act to prohibit the specification of the wetlands and other waters of the United States in the Yazoo Backwater Area, as that area was described in the 2007 FSEIS, as a disposal site for the discharge of dredged or fill material for the purpose of construction of the Yazoo Pumps Project and all the alternatives proposed by the Corps that included a 14,000 cfs pumping plant.

190.   The Veto is a final agency action that prohibits the Corps from allowing any discharges inconsistent with the Veto.  33 U.S.C. § 1344; 40 C.F.R. § 231.6.

191.   The Veto remains in full force and effect.  EPA did not comply with the procedural or substantive requirements to legally revoke the Veto.

192.   Nevertheless, the Corps approved the Yazoo Pumps Redo, which contains the same 14,000 cfs pumping plant feature that would follow the same operating parameters to drain the same project area and achieve the same purpose as the long-vetoed Yazoo Pumps Project.

193.     Operation of the Yazoo Pumps Redo would degrade at least 38,774 acres of wetlands, which far exceeds the minimum amount of wetland impacts prohibited by the Veto due to the unacceptable adverse effects on fish and wildlife resources.

194.     Construction of the Yazoo Pumps Redo would involve the discharge of fill material into the same wetlands prohibited from specification by the Veto as a present or future disposal site.

195.     The Veto squarely prohibits the Yazoo Pumps Redo because it includes the same 14,000 cfs pumping plant whose construction would require the discharge of fill material into the same wetlands prohibited by the Veto, and whose operation would cause unacceptable adverse effects far in excess of the amount prohibited by the Veto.

196.     Accordingly, the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Veto and Clean Water Act.  The decision therefore should be set aside under the APA.  5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### The Corps Failed to Demonstrate the Yazoo Pumps Redo Is the Least Environmentally Damaging Practicable Alternative (33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)

197.     The Conservation Organizations incorporate by reference all of the preceding paragraphs.

198.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To that end, the Clean Water Act prohibits the unpermitted discharge of any pollutant, including dredge or fill material, into waters of the United States.  *Id.* § 1311(a).  Before allowing the discharge of dredge or fill material into waters of the United States, including for the Corps' own civil works projects, the Corps must comply with the Section 404(b)(1) Guidelines.  *See* 40 C.F.R. Part 230.

199.    The Section 404(b)(1) Guidelines prohibit the Corps from allowing the discharge of any dredge or fill material into waters of the United States if there is a less-environmentally damaging practicable alternative.  33 C.F.R. § 336.1(c); *See* 40 C.F.R. § 230.10(a).

200.    Practicable alternatives include "[a]ctivities which do not involve a discharge of dredged or fill material."  40 C.F.R. § 230.10(a)(1)(i).  Where a discharge is proposed for a special aquatic site, such as a wetland, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.  *Id*. § 230.10(a)(3).

201.    The EPA and public identified less-environmentally damaging practicable alternatives to the Yazoo Pumps Redo, including the Resilience Alternative, which would provide prompt, effective, sustainable, and environmentally sound relief to communities in the Yazoo Backwater Area.  The Resilience Alternative would avoid the destruction or modification of any special aquatic sites, and thus is both presumed to, and would in fact, have less adverse impacts on the aquatic ecosystem.

202.    The Corps did not consider the Resilience Alternative or any other alternative to the long-vetoed pumps project in the 2020 FSEIS.  Instead, the 2020 FSEIS focuses solely on approving the construction and operation of a 14,000 cfs pumping plant (the Yazoo Pumps Redo), without demonstrating it is the least environmentally damaging practicable alternative.  To the contrary, the Yazoo Pumps Redo would undoubtedly cause far greater impacts to the aquatic ecosystem than the Resilience Alternative.  It would also cause far greater impacts to the aquatic ecosystem than the Yazoo Pumps Project by destroying additional wetlands during construction of the same pumping plant feature and eliminating thousands of acres of previously proposed mitigation and restoration.

203.    The Corps violated the Section 404(b)(1) Guidelines by failing to demonstrate that the

Yazoo Pumps Redo is the least environmentally damaging practicable alternative.  Accordingly,

the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with the Clean Water Act and Section 404(b)(1) Guidelines.  The

decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

**The Corps Failed to Demonstrate That the Yazoo Pumps Redo
Will not Cause Unacceptable Adverse Impacts to Aquatic Resources
(33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

204.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

205.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical,

and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  To that end, the Clean

Water Act prohibits the unpermitted discharge of any pollutant, including dredge or fill material,

into waters of the United States.  *Id.* § 1311(a).  Before allowing the discharge of dredge or fill

material into waters of the United States, the Corps must comply with the Section 404(b)(1)

Guidelines.  *See* 40 C.F.R. Part 230.

206.    The Section 404(b)(1) Guidelines prohibit the Corps from authorizing the discharge of

dredge or fill material if the proposed discharge "will cause or contribute to significant

degradation of the waters of the United States."  40 C.F.R. § 230.10(c).  The Corps must

demonstrate that the proposed project will not cause "[s]ignificantly adverse effects . . . on

aquatic ecosystem diversity, productivity and stability.  Such effects may include, but are not

limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate

nutrients, purify water, or reduce wave energy."  *Id.* § 230.10(c)(3).

207.    To demonstrate that a proposed project will not cause significant adverse impacts, the

Corps must make factual determinations regarding the "nature and degree of effect" of the

proposed discharge on both the "structure and function of the aquatic ecosystem and organisms." *Id.* § 230.11(e).  The Corps must consider the extent to which the proposed project will "reduce or eliminate" wetland functions, including nutrient exchange, filtration function, and aquatic habitat values, such as spawning and rearing grounds.  *Id*. §§ 230.31(b), 230.41(b).

208.   The Yazoo Pumps Redo would reduce the timing, duration, and frequency of flooding on wetlands located above the 1-year floodplain.  Accordingly, the Corps had an obligation to assess the impacts of the pumps on wetlands and associated aquatic resources in the Yazoo Backwater Area.

209.   Even the fatally flawed 2020 FSEIS demonstrates that the Yazoo Pumps Redo will degrade wetland functions on 38,744 acres of wetlands, which constitutes significant degradation in violation of the Clean Water Act.

210.   Moreover, it is clear that the 2020 FSEIS severely understates the true extent of harm from the Yazoo Pumps Redo, including because the Corps once again constrained its analysis to only a small subset of wetlands located within the 2-year floodplain that receive ≥ 14 consecutive days of flooding.  This arbitrary limitation violates the Section 404(b)(1) Guidelines, misapplies the Corps' own guidance, disregards EPA's statistically valid field survey of wetlands, and runs contrary to fundamental principles of wetland hydrology.  This oversight contravenes the Section 404(b)(1) Guidelines and overlooks a critical factor in violation of the APA.

211.   As a result, the Corps has failed to demonstrate that the Yazoo Pumps Redo will not cause significant adverse impacts to wetlands and aquatic resources, thereby violating the Clean Water Act and Section 404(b)(1) Guidelines.  Accordingly, the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with the Clean Water Act and Section 404(b)(1) Guidelines.  The decision therefore should be

set aside under the APA. 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### The Corps Failed to Adequately Mitigate the
### Significant Adverse Impacts of the Yazoo Pumps Redo
### (33 U.S.C. § 1251 et seq., 33 U.S.C. § 2283, and 5 U.S.C. § 706)

212.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

213.    The WRDA requires the Corps to mitigate all losses to fish and wildlife caused by a

project unless the Secretary determines that the adverse impacts to fish and wildlife would be

"negligible."  33 U.S.C. § 2283(d)(1).  In addition, the Corps "must ensure that impacts to

bottomland hardwood forests are mitigated in-kind, and other habitat types are mitigated to not

less than in-kind conditions, to the extent possible."  *Id*.

214.    The WRDA also requires the Corps to provide "a specific plan to mitigate for damages to

ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses

created by such project."  *Id.*  The specific mitigation plan must include a set of components.  *Id.*

§ 2283(d)(1).

215.    The WRDA also requires the Corps to comply with "the mitigation standards and policies

established pursuant to the regulatory programs" administered by the Corps, such as the Section

404(b)(1) Guidelines.  33 U.S.C. § 2283(d).

216.    The Section 404(b)(1) Guidelines prohibit the Corps from authorizing the discharge of

dredge of fill material "unless appropriate and practicable steps have been taken which will

minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R.

§ 230.10(d).

217.    To satisfy this requirement, the Corps must determine "what is practicable and capable of

compensating for the aquatic resource functions that will be lost as a result of the permitted

activity." *Id*. § 230.93(a)(1).  In making this determination, "the district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project." *Id*.

218.    The Corps must also prepare a specific mitigation plan for the compensatory mitigation site. *Id*. § 230.94(c).  Among other things, the mitigation plan must describe "the factors considered during the site selection process," including the practicability of accomplishing mitigation on "the compensatory mitigation project site." *Id*. § 230.94(c)(3).  This requires a description of the "baseline" ecological characteristics on the site, such as the "existing plant communities" and "historic and existing hydrology." *Id*. § 230.94(c)(5).  It also requires "a delineation of waters of the United States of jurisdictional waters" on the site. *Id*.

219.    The Corps violated the WRDA, Clean Water Act, and the Section 404(b)(1) Guidelines by severely underestimating the pumps' adverse impacts on wetlands and aquatic resources, including thousands of acres of wetlands entirely excluded from the 2020 FSEIS despite their critical role in the ecosystem.  As a result, the Corps failed to provide any mitigation for the complete loss and/or significant degradation of wetlands, wildlife, and fisheries that the Corps entirely omitted from its analysis or mitigation proposal.

220.    The Corps also violated the WRDA, Clean Water Act, and Section 404(b)(1) Guidelines by failing to provide a detailed mitigation plan.  The Corps did not identify any actual mitigation sites, did not provide the mandatory details regarding those sites, and did not develop work plans for those sites, despite the obligation to do so.  As a result, the Corps lacks the site-specific data needed to ensure the proposed reforestation will successfully replace the functions degraded or eliminated by the pumps.  To the contrary, the Corps' own data demonstrates that its conceptual

proposal to reforest hypothetical sites will not replace lost wetland functions and thus fails to comply with the Corps' mitigation obligations.

221.     In addition, the Corps relied on an internally inconsistent analysis, which discounted the pumps' impacts on fish habitat, but then failed to apply an equivalent discount to the fish habitat the Corps proposes to create through reforestation.  This inconsistency skewed the analysis and led the Corps to underestimate its mitigation requirements by thousands of acres.

222.     Furthermore, the Corps failed to demonstrate that the proposed groundwater wells will provide the ecological benefits claimed by the Corps.  Rather than providing data establishing the claimed benefits, the Corps simply assumed that the groundwater wells would increase surface flows and thereby overlooked transmission losses, which could reduce if not negate any of the claimed benefits.

223.     As a result of these errors, among others, the Corps failed to comply with its obligation under the WRDA to offset all losses to fish and wildlife and ensure in-kind mitigation for all impacts to bottomland hardwood forests.  The Corps also failed to demonstrate that the Yazoo Pumps Redo minimizes the significant adverse impacts to wetland functions and aquatic resources, thereby violating the Clean Water Act and Section 404(b)(1) Guidelines.  In fact, EPA concluded that the Corps' conceptual mitigation plan "includes a number of deficiencies that would preclude a private party from receiving a Section 404 permit."

224.     Accordingly, the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the WRDA, Clean Water Act, and Section 404(b)(1) Guidelines.  The decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

**FIFTH CLAIM FOR RELIEF**

**The Corps Failed to Analyze
Reasonable Alternatives to the Yazoo Pumps Redo
(42 U.S.C. § 4332 and 5 U.S.C. § 706)**

225.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

226.    NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).

227.    To do so, agencies must "rigorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).  The failure to consider a reasonable alternative violates NEPA.

228.    When preparing a supplemental environmental impact statement, agencies must rigorously evaluate all reasonable alternatives.  40 C.F.R. § 1502.14(a).  This includes evaluation of any prior alternatives considered or dismissed by the agency in light of the "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).

229.    EPA and the public repeatedly urged the Corps to consider reasonable alternatives to the pumps project, including modern approaches to reduce flood damages, such as the Resilience Alternative.  This alternative is technologically feasible, relies on funded programs, and would meet the project purpose of reducing flood damages in the Yazoo Backwater Area.  The Corps' refusal to analyze the Resilience Alternative in the 2020 FSEIS violates NEPA and led to an uninformed decision to approve the Yazoo Pumps Redo.

230.    The Corps also violated NEPA by refusing to reexamine prior alternatives, such as those identified in the 2007 FSEIS, in light of new information and changed circumstances.  The 2020 FSEIS demonstrates that the pumps will not provide the flood relief promised and could

59

significantly increase flood risk to downstream communities.  The 2020 FSEIS also contains new

hydraulic data, demographic data, land use data, and economic data, all of which alter the Corps'

analysis of alternatives to the pumps, including the economic feasibility of alternatives, including

the pumps themselves.  The Corps' steadfast refusal to reexamine any alternatives to the pumps

in the 2020 FSEIS, despite this significant new information and changed circumstances, violates

NEPA and precludes an objective evaluation of whether or not to approve the Yazoo Pumps

Redo.

231.    Accordingly, the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with the NEPA.  The decision therefore

should be set aside under the APA. 5 U.S.C. § 706(2)(A).

## SIXTH CLAIM FOR RELIEF

### The Corps Failed to Analyze
### Direct, Indirect, and Cumulative Impacts
### (42 U.S.C. § 4332(2)(C) and 5 U.S.C. § 706)

232.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

233.    NEPA requires federal agencies to take a "hard look" at the environmental impacts of a

proposed project and "provide [a] full and fair discussion of significant impacts" associated with

a federal decision.  40 C.F.R. § 1502.1; 42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16,

1508.25(c).

234.    A comprehensive assessment of impacts to fish and wildlife is particularly critical since

EPA issued the Veto because the Yazoo Pumps "would result in unacceptable adverse effects on

fishery areas and wildlife."  Indeed, the Veto "is based solely on environmental harms to

fisheries and wildlife in the Yazoo Backwater Area" as "is appropriate given the structure and

language of the CWA and case law."  In its comments on the 2007 Final Supplemental

Environmental Impact Statement, the Department of the Interior similarly concluded that the

Yazoo Pumps "will have unacceptable adverse effects on fishery areas, including spawning and breeding areas" and "unacceptable adverse effects on wildlife, specifically to the area's breeding and migratory birds, including landbirds, shorebirds, wading birds, and waterfowl."

235.    The Corps nevertheless failed to take a hard look at the adverse impacts of the Yazoo Pumps Redo on wetland functions, wildlife, and fisheries in the Yazoo Backwater Area.

236.    As an initial matter, the 2020 FSEIS arbitrarily excluded highly significant impacts to thousands of acres of wetlands that provide essential fish and wildlife habitat based on an indefensible approach that overlooks the facts on the ground, the overwhelming scientific literature, and the expert advice of the EPA and the Service.

237.    The Corps also failed to take a hard look at the impacts of the pumps on the fisheries, birds, waterfowl, amphibians, reptiles and other wildlife in the Yazoo Backwater Area that rely on the area's wetlands and other aquatic resources.  Rather than analyzing the extensive impacts to those species, however, the 2020 FSEIS instead completely ignores impacts to many species and attempts to minimize impacts to fish and wildlife by restricting its analysis to a mere fraction of the pumps' actual impacts.  Even then, the 2020 FSEIS relies on a series of unfounded assumptions to discount or misstate the pumps' impacts.  This analysis is contrary to the science and violates NEPA's hard-look requirement.

238.    In addition, the Corps failed to take a hard look at the adverse impacts of the Yazoo Pumps Redo on homes, communities, and/or infrastructure along the Yazoo River, particularly in areas downstream of the Deer Creek site's pump discharge point.  Instead, the Corps relied on a brief summary of the findings of an indefensible hydrologic model to claim that any downstream flood impacts would be negligible.  This brief summary also misrepresents the results of that model, which project that operating the pumps would increase water levels in the Yazoo River

by almost a food during flood events, which could overtop the Yazoo Backwater Levee, flood International Paper's water treatment ponds, or inundate downstream communities with significant consequences.

239.    These failures violate NEPA and are arbitrary, capricious, an abuse of discretion in violation of the APA.  5 U.S.C. § 706(2)(A).  The decision therefore should be set aside under the APA.  *Id.*

**SEVENTH CLAIM FOR RELIEF**

**The Corps Failed to Respond to Public
Comments Identifying Flaws in the 2020 FSEIS
(42 U.S.C. § 4332 and 5 U.S.C. § 706)**

240.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

241.    NEPA recognizes the fundamental importance of public involvement in decisions that affect the quality of the environment.  40 C.F.R. § 1500.1(b) (requiring that agencies make "high quality" environmental information available to public officials and citizens "before decisions are made and before actions are taken."); *id.* § 1502.1 (EIS must provide decisionmakers and public a "full and fair discussion" of impacts and of reasonable alternatives to avoid or minimize impacts).

242.    An agency preparing an EIS has a duty to assess, consider, and respond to all comments submitted by the public.  *Id.* § 1503.4(a).

243.    The Corps, however, failed to respond to technical comments and information submitted by the public that documented flaws in the Draft SEIS.  Instead, the Corps finalized the 2020 FSEIS within four days of the close of the comment period without responding to the public's comments, despite receiving 50,500 comments opposing the Yazoo Pumps Redo.

244.   Accordingly, the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with NEPA.  The decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

**EIGHTH CLAIM FOR RELIEF**

**The Corps Failed to Subject the 2020 FSEIS
to the Mandatory Independent External Peer Review
(33 U.S.C. § 2343 and 5 U.S.C. § 706)**

245.   The Conservation Organizations incorporate by reference all of the preceding paragraphs.

246.   The WRDA requires the Corps to subject project studies to "a peer review by an independent panel of experts" if the project's total costs, including mitigation costs, exceed $200 million or if the project is "controversial."  33 U.S.C. § 2343(a)(3)(A)(i), (iii).

247.   A project is controversial if "there is a significant public dispute as to the size, nature, or effects of the project" or "there is a significant public dispute as to the economic or environmental costs or benefits of the project."  *Id.* § 2343(a)(4).

248.   In all cases, the peer review must be carried out concurrently with the project study and must be completed "not more than 60 days after the last day of the public comment period for the draft project study," unless the Chief of Engineers determines that more time is necessary.  *Id.* § 2343(b)(1).

249.   The 2020 FSEIS is a project study that triggers a mandatory independent external review under the WRDA as it evaluates a civil works project that will cost over $200 million and that is unquestionably controversial, both in terms of environmental impacts and economic costs.  In fact, the 2007 FSEIS estimated the pumps' costs at $220 million, which has likely ballooned to $450 million, if not more.

250.    The Corps violated the WRDA by failing to undertake an independent external peer review of the 2020 FSEIS.  The Corps did not discuss this review anywhere in the 2020 FSEIS or provide any basis for failing to carry out that mandatory review.

251.    Accordingly, the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the WRDA.  The decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

### NINTH CLAIM FOR RELIEF

**The Corps and Service Violated the
Endangered Species Act By Failing to Consult Formally
(16 U.S.C. § 1536(a)(2) and 5 U.S.C. § 706)**

252.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

253.    Section 7 of the Endangered Species Act prohibits federal agencies from undertaking actions that are "likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification of" critical habitat.  *Id*. § 1536(a)(2).

254.    To ensure compliance with section 7's substantive mandate, the Endangered Species Act and its implementing regulations impose specific procedural duties on federal agencies, requiring an "action agency"—in this case, the Corps—to consult with the Service before undertaking any "action" that "may affect" a listed species or its designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  Furthermore, both the Corps and Service have an ongoing obligation to reinitiate consultation if new information reveals effects not previously considered or if the action is modified in a manner that causes unanalyzed effects to a species. 50 C.F.R. § 402.16.

255.    Construction and operation of a 14,000 cfs pumping plant in the Yazoo Backwater Area—the Yazoo Pumps Redo—may affect the federally listed pondberry, triggering the Corps'

obligation to formally consult with the Service to ensure that the proposed project is not likely to jeopardize the species. 50 C.F.R. § 402.14(a).

256.     The Corps, however, refused to formally consult with the Service and instead unilaterally terminated the process so that it could hastily approve the Yazoo Pumps Redo.  This approach violates the Endangered Species Act because the Service both "disagreed with the [Corps'] determination of no adverse effects," and also affirmatively determined that the Yazoo Pumps Redo would likely adversely affect the endangered pondberry.

257.     The Service also violated its obligation to reinitiate formal consultation in the face of the Corps' recalcitrance.  The Service identified "steep declines" in pondberry colonies in the Yazoo Backwater Area, as well as significant changes in hydrology due to prior flood control projects. Given this significant new information, the Service had an obligation to not just disagree with the Corps' arbitrary finding of no adverse effects, but affirmatively reinitiate formal consultation and prepare a revised biological opinion that assesses the total impacts of constructing and operating a 14,000 cfs pumping plant on the pondberry's survival and recovery.

258.     The Corps and Service's failure to formally consult was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Endangered Species Act.  5 U.S.C. § 706(2)(A).  The Corps' decision approving the Yazoo Pumps Redo should be set aside under the APA and ESA.  *Id.*

**TENTH CLAIM FOR RELIEF**

**The Corps Violated the Endangered Species Act**
**By Failing to Ensure Against Jeopardy**
**(16 U.S.C. § 1536(a)(2) and 5 U.S.C. § 706)**

259.     The Conservation Organizations incorporate by reference all of the preceding paragraphs.

260.     Section 7 of the Endangered Species Act prohibits federal agencies from undertaking actions that are "likely to jeopardize the continued existence" of any listed species or "result in

the destruction or adverse modification of" critical habitat.  *Id*. § 1536(a)(2).  The action agency thus has an independent obligation under the Endangered Species Act to ensure that its proposed action does not jeopardize—"reduce appreciably the likelihood of both the survival and recovery"—of any listed species.  *Id.*; *see* 50 C.F.R. § 402.02.

261.    The Corps violated the Endangered Species Act by relying on a fundamentally flawed Revised BA that failed to ensure the Yazoo Pumps Redo will not jeopardize the continued existence of the pondberry.  The Revised BA failed to consider the relevant factors and ignored contrary evidence, including the best available science and the Service's expert determinations regarding the adverse effects of the Yazoo Pumps Redo.  The Revised BA also failed to provide an adequate discussion of the environmental baseline and contained no analysis of whether the Yazoo Pumps Redo will reduce appreciably the likelihood of both the survival and recovery of the pondberry.

262.    Due to these errors, the Corps failed to satisfy its obligation to ensure the Yazoo Pumps Redo is not likely to jeopardize the endangered pondberry.  *See* 16 U.S.C. § 1536(a)(2). Accordingly, the Corps' approval of the Yazoo Pumps Redo was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA.  The decision therefore should be set aside under the APA and ESA. 5 U.S.C. § 706(2)(A).

**REQUEST FOR RELIEF**

The Conservation Organizations request that the Court grant the following relief:

A. Declare that the Corps' 2020 FSEIS and Record of Decision approving the Yazoo Pumps Redo are arbitrary, capricious, and not in accordance with the law;

B. Declare that the Corps and Service's failure to reinitiate consultation was arbitrary, capricious, and not in accordance with the law;

C. Vacate and set aside the Corps' 2020 FSEIS and Record of Decision;

D. Enter appropriate injunctive relief;

E. Award the Conservation Organizations all reasonable costs and attorneys' fees as authorized by law; and

F. Award the Conservation Organizations such other relief as this Court deems just and appropriate.

Dated: April 14, 2021                    Respectfully submitted,

*/s/ Anna Sewell*
Anna Sewell (D.C. Bar No. 241861)
Earthjustice
1001 G St. NW Suite 1000
Washington, DC  20001
Tel.: (202) 667-4500 ext. 5233
asewell@earthjustice.org

*Local Counsel for Plaintiffs American Rivers, National Audubon Society, Sierra Club, and Healthy Gulf*

*/s/ Stuart C. Gillespie*
Stuart C. Gillespie (CO Bar No. 42861)
(*pro hac vice pending*)

Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 996-9616
sgillespie@earthjustice.org

*/s/ Sharmeen Morrison*
Sharmeen Morrison (NY Bar No. 5759907)
(*pro hac vice pending*)

Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
Tel.: (212) 845-7376
smorrison@earthjustice.org

*Counsel for Plaintiffs American Rivers, National Audubon Society, Sierra Club, and Healthy Gulf*